## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF MISSISSIPPI
### (Aberdeen Division)

| | | |
|---|---|---|
| **BLAKE JOHNSON,** | ) | |
| | ) | |
| **PLAINTIFF** | ) | |
| | ) | |
| **v.** | ) **CASE NO.:** 1:22-CV-047-SA-RP | |
| | ) | |
| **DEERE & CO. (d/b/a JOHN DEERE)** | ) | |
| | ) | |
| **DEFENDANT** | ) | |

## COMPLAINT

Plaintiff alleges upon personal knowledge as to itself and its own actions, and upon information and belief, including the investigation of counsel as follows:

### I.     NATURE OF ACTION

1.      This case is about John Deere's monopolization of the repair service market for John Deere ("Deere") brand agricultural equipment with onboard central computers known as engine control units, or "ECUs." Farmers have traditionally had the ability to repair and maintain their own tractors as needed, or else have had the option to bring their tractors to an independent mechanic. However, in newer generations of its agricultural equipment, Deere has deliberately monopolized the market for repair and maintenance services of its agricultural equipment with ECUs ("Deere Repair Services") by making crucial software and repair tools inaccessible to farmers and independent repair shops. Furthermore, Deere's network of highly-consolidated independent dealerships (the "Dealerships") is not permitted through their agreements with Deere to provide farmers or repair shops with access to the same software and repair tools the Dealerships have. As a result of shutting out farmers and independent repair shops from accessing the necessary resources for repairs, Deere and the Dealerships have cornered the Deere Repair Services Market

in the United States for Deere-branded agricultural equipment controlled by ECUs and have derived supracompetitive profits from the sale of repair and maintenance services.

2.     This is an antitrust class action pursuant to Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) brought by Plaintiff Blake Johnson on his behalf and on behalf of a class of persons and entities similarly situated. Plaintiff seeks to represent those persons and entities who purchased repair services from Defendant Deere and Co. (d/b/a John Deere) and Deere- affiliated independent Dealerships and technicians in the Deere Repair Services Market for Deere agricultural equipment from January 12, 2018 to the present.

3.     John Deere is indisputably the biggest player in agricultural machinery markets in the United States. Deere wields significant economic power in the market for large tractors and combine tractors in North America[1] and has a larger market share than that of the next two biggest tractor makers, Case New Holland and Kubota Corp., combined.[2]

4.     Modern John Deere tractors, combines, and other agricultural equipment with ECUs (collectively referred to herein as "Tractors") have grown increasingly technologically advanced. Tractors manufactured in the last two decades now require proprietary software and associated repair tools (collectively referred to as "Software") to perform or complete many repairs. For example, an owner of a Tractor may be able to replace the transmission on their equipment, but that Tractor will not operate unless proprietary John Deere Software "approves" the newly-installed part. A farmer or mechanic may have the necessary mechanical parts,

---

[1] Jennifer Reibel, *Manufacturer Consolidation Reshaping the Farm Equipment Marketplace,* Farm Equipment (Aug. 29, 2018), https://www.farm-equipment.com/articles/15962-manufacturer-consolidation-reshaping-the-farm-equipment-marketplace.

[2] Peter Waldman & Lydia Mulvany, *Farmers Fight John Deere Over Who Gets to Fix an $800,000 Tractor*, Bloomberg Businessweek (Mar. 5, 2020), https://www.bloomberg.com/news/features/2020-03-05/farmers-fight-john-deere-over-who-gets-to-fix-an-800-000-tractor.

knowledge, and the skill to repair a Tractor, but without access to the Software, the repair is not recognized by the Tractor's ECU, making the repair ineffective and the Tractor still unable to function properly.

5.      Despite the use of, and access to, this Software being essential to the continued functionality of its Tractors, Deere has deliberately made this necessary Software unavailable to individual owners and independent repair shops. Instead, Deere makes the full Software available only to Deere Dealerships and technicians, who are not permitted by Deere to sell it.

6.      Historically, farmers who owned Deere Tractors have had the option of repairing their Tractors themselves or taking them to an independent repair shop of their choosing. By making the Software, for all practical purposes, unavailable, Deere has succeeded in foreclosing competition in the multi-billion-dollar Deere Repair Services Market.

7.      Deere and the Dealerships are highly motivated to prevent competition, either from independent repair shops selling Deere Repair Services, or from farmers with the knowledge and skills to perform their own repairs. Deere's business for its Repair Services is three to six times more profitable than its sales of original equipment.

8.      Deere's monopolization of the Deere Repair Services Market allows Deere and the Dealerships to charge and collect supracompetitive prices for its services every time a piece of equipment requires the Software to diagnose or complete a repair. Consequently, Plaintiff and Class members have paid millions of dollars more for the repair services than they would have paid in a competitive market.

9.      John Deere has demonstrated that it understands that farmers have a right to repair their own Tractors, while at the same time misleading the public regarding how easy it is for

farmers or independent repair shops to perform repairs.[3]

10.    After a trade group representing Deere made a highly-publicized promise in 2018 to make the necessary Software and tools available by January 2021, Deere has failed to follow through on this promise. In 2021, multiple investigative journalists attempted to determine whether the Software was available. The Dealerships' response was that they did not sell the Software, or that it was only available to licensed dealers, and the Dealership was not allowed to sell it to anyone else.[3]

11.    Deere continues to exploit its relationship with customers who have purchased extremely expensive Tractors, locking customers into paying for expensive and inconvenient Repair Services from Deere and its Dealerships. Deere has created an effective tying arrangement, whereby the purchase of Deere Repair Services is tied to the initial purchase of Deere Tractors.

12.    The motive behind restricting access to the Software is simple: Deere and its Dealerships did not want their revenue stream from service and repair—a far more lucrative business than original equipment sales—to end when the equipment is purchased, as it often did in the past when owners could perform their own repairs or rely on individual repair shops.

13.    Deere's scheme to prevent independent repairs creates additional revenue for Deere over the entire useful life of every piece of equipment it sells.

14.    Deere unlawfully stifles competition by blocking independent repair shops and reducing consumer choice in what would otherwise be a robust and competitive repair aftermarket, thereby artificially increasing Deere Repair Services prices to supracompetitive

---

[3] Jason Koebler & Matthew Gault, *John Deere Promised Farmers It Would Make Tractors Easy to Repair. It Lied.*, Vice Motherboard (Feb. 18, 2021), https://www.vice.com/en/article/v7m8mx/john-deere-promised-farmers-it-would-make-tractors- easy-to-repair-it-lied.

levels.

15.     Deere's aggressive, forced consolidation of its Dealerships also was implemented with the intent of further limiting price competition for Deere Repair Services, even among Deere Dealerships.

16.     As a result of Deere's unlawful withholding of the necessary Software to perform repairs from farmers and independent repair shops and its forced consolidation of the Dealerships, Plaintiff and the Class paid artificially inflated prices for Deere Repair Services during the Class Period. Prices in the Repair Services Market exceeded the amount they would have paid if the prices had been determined by a competitive market. Plaintiff and Class members were therefore injured by Defendant's conduct.

17.     Deere's illegal monopoly of the Deere Repair Services Market should be enjoined and dismantled, and Plaintiff and the Class should be reimbursed by Deere for the amount they overpaid for Deere Repair Services.

18.     Deere violated Section 1 of the Sherman Act by forcing consolidation of its affiliated Dealerships to eliminate inter-brand competition for Repair Services. Deere also violated Section 1 of the Sherman Act through its arrangements with Co-conspirator Dealerships to not sell the Software to farmers and independent repair shops. Finally, Deere violated Section 1 of the Sherman Act through forcing Plaintiff and Class Members to purchase Deere Repair Services from Deere once they were locked into ownership of an expensive Deere Tractor. Deere's tying arrangement between Deere Tractors and Repair Services had both the intent and effect of harming competition in the market for Deere Repair Services.

19.     Deere also violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize the Deere Repair Services Market in a manner that harmed competition and

injured the purchasers of such services by reducing choice and increasing prices in this market to supracompetitive levels. Deere has also leveraged its monopoly power over Deere Software to tie sales of its Tractors to sales of Deere Repair Services, in violation of Section 2 of the Sherman Act.

20.     Deere has unjustly enriched itself by profiting from Plaintiffs' payment of supracompetitive prices for Deere Repair Services in violation of the antitrust laws and should be made to disgorge these profits.

21.     Plaintiff seeks declaratory and injunctive relief, treble and exemplary damages, costs, and attorneys' fees. As for equitable relief, Plaintiff seeks an order requiring Deere to make the necessary Software available, at reasonable cost, to individuals and repair shops.

## II.     JURISDICTION AND VENUE

22.     Plaintiff brings this action on behalf of himself and the Class under Section 16 of the Clayton Act (15 U.SC. § 26) to secure injunctive relief against Defendant for violating Sections 1and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), and to recover actual and compensatory damage,treble damages, interest, costs and attorneys' fee for the injury caused by Defendant's conduct.

23.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

24.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because sufficient diversity of citizenship exists between parties in this action, the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and there are 100 or more members of the proposed class.

25.     Venue is appropriate in this District pursuant to Sections 4, 12, and 16 of the

Clayton Act, 15 U.S.C. 28 U.S.C. §15(a), and 28 U.S.C. § 1391(b), (c) and (d) because Defendant Deere & Company transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

26.     The activities of Defendant as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

## III.   PARTIES

### A.  Plaintiff.

27.     Plaintiff Blake Johnson is an adult resident citizen of McNairy County, Tennessee.

### B.  Defendant and Co-conspirators.

28.     Deere & Co. is a publicly-traded company headquartered in Moline, Illinois.

29.     "Defendant" as used herein, includes, in addition to those identified specifically above, all of the named Defendant's predecessors, including companies that merged with or were acquired by the named Defendant, as well as Defendant's wholly-owned or controlled subsidiaries, dealerships, affiliated and/or authorized technicians, and/or Co-conspirators that sold Deere Repair Services in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States during the Class Period.

30.     Co-conspirators include independently-owned dealerships with agreements with Deere giving them the right to sell Deere Tractors and Deere Repair Services. Based on recent data, out of the 1,544 Dealerships affiliated with Deere, 91% of these Dealerships are owned by a"Big Dealer," *i.e.*, a dealer that owns 5 or more individual locations. Although not an exhaustive

list, the largest Dealership groups are Ag-Pro Companies (75 locations in 8 states), United Ag & Turf (53 locations in 6 states), C&B Operations (36 locations in 6 states), Papé Machinery (35 locations in 5 states); RDO Equipment (32 locations in 9 states); Brandt Holdings (32 locations in 5 states); Greenway Equipment (31 locations in 2 states); Van Wall Group (31 locations in 4 states); Quality Equipment (28 locations in 2 states) and TriGreen Equipment (19 locations in 2 States).

## IV.    TRADE AND COMMERCE

31.    During the Class Period, Defendant, directly or through its subsidiaries or affiliated Dealerships, sold Deere Repair Services in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

32.    During the Class Period, Defendant controlled all of the market for Deere Repair Services in the United States.

33.    Defendant's business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## V.    RELEVANT MARKETS

34.    **Deere Repair Services Market.** The principal relevant market to evaluate Defendant's anticompetitive conduct is the Deere Repair Services Market.

35.    The Deere Repair Services Market constitutes various services and labor to repair, maintain, and clear fault codes from Deere Tractors.[4]

36.    There are no available substitutes for Deere Repair Services, and Deere Repair

---

[4] As defined *supra*, Deere "Tractors" for purposes of this litigation include all John Deere tractors, combines, and other agricultural equipment with ECUs.

Services are not interchangeable with any other manufacturers' service.

37.     The relevant geographic market is the United States.

38.     Defendant Deere has market and monopoly power in the relevant market through its control over access to the Software.

39.     Any independent repair shops who desire to compete with Deere in the Deere Repair Services Market would face insurmountable barriers. Defendant's effective total control of the Software means that independent repair shops are unable to access the necessary resources to be able to meaningfully compete with Deere. Similarly, any farmers who wish to perform their own repairs and/or maintenance are also unable to access the resources necessary to do so.

40.     Independent repair shops and farmers cannot compete effectively in the Deere Repair Services Market without access to the Software.

41.     **Deere Software Market.** As discussed above, Defendant maintains market and monopoly power over the market for Deere Software. There is no available substitute for Deere Software, and it is not interchangeable with any other manufacturers' product.

42.     **Tractor Markets.** The Deere Repair Services market and the market for Tractors are distinct. The "Tractor Markets" include the United States product markets for agricultural farm tractors, which include 2WD Farm Tractors, Compact Tractors, 4WD Farm Tractors, Row Crop Tractors, Scraper Tractors, Specialty Tractors, Utility Tractors, and Self-Propelled Combines. Defendant Deere is the largest agricultural machinery company in the world and has appreciable economic power in the U.S. Tractor Markets.

## VI.    FACTUAL ALLEGATIONS

43.     Farmers traditionally and historically have been able to perform their own repairs on their own tractors. However, as software has becoming increasingly intertwined with basic

operations of farming equipment, John Deere has restricted access to the necessary tools to make repairs, thereby cutting out owners and independent repair shops from the ability to make repairs to newer equipment.

### A. Technology in John Deere Tractors

44.     Modern Deere Tractors are technologically complex machines. These Tractors run firmware that is necessary for the Tractor to perform its basic functions. Without the firmware, the product is incomplete and will not run, making the firmware as vital a part to the basic functioning of a Tractor as a steering wheel or an engine. The code that runs the internal engine and the transmission components that are required to make the Tractor do anything are effectively part of the machine. The Tractors will not operate without that code.

45.     The central computer on a Tractor is the Engine Control Unit, or "ECU." The ECU determines how—and if—the Tractor functions.

46.     Like cars, John Deere Tractors use a large number of sensors throughout the equipment that are constantly monitored by the ECU. When a sensor notices an error, no matter how small or serious, it can put the machine into "limp mode," allowing farmers to move the machine slowly but not operate it fully. When the problem is diagnosed and repaired, the error code is cleared and the machine can continue working.[5]

47.     According to a report from a U.S. Public Interest Research Group, the John Deere S760 combine harvester has 125 different computer sensors in it. If any one of those sensors throw an error code, the combine will enter limp mode.

48.     Troubleshooting Deere Tractors—e.g., interpreting the error codes—requires

---

[5]  Koebler & Gault, *supra* note 3.

Software that Deere refuses to make available to farmers.

49.     Since about 2000, Deere Tractors began using what is known as "CAN bus"

systems in their machinery, standing for Controller Area Network. CAN bus is essentially a

central electrical system that allows communications between different parts of the machinery.

Sales manuals for Deere Tractors explain that an advantage of the system "allows the technician

at the dealership to plug into the system using the Service ADVISOR™ computer program. The

Service ADVISOR program links up to the tractor's electrical system to read the

communications between the controllers to determine where the problem is located and how it

can be fixed."[6]

50.     Service ADVISOR, per John Deere's own sales manual materials, is

> a tool used by John Deere **dealerships** capable of
> providing technical and mechanical support for technicians
> and service managers through the use of a laptop computer.
> Service ADVISOR provides symptom-based diagnostics
> information, specific machine information, and electronic
> technical information. Italso offers a connection to John
> Deere help and solutions through an extranet connection at
> the workshop and in the field.
>
> Service ADVISOR is a fast diagnostic testing system for all
> controller area network(CAN) bus tractors. This system is
> the cutting edge of service technology and willsave time
> and money by faster equipment repair.

 (emphasis added).

51.     Even if the farmer is able to interpret the error code and determine what the problem

is with the Tractor, without access to the necessary software tools, farmers must call the

dealership to repair, or clearfault codes for, their machine.  Because of the integration of the

---

[6]  [6]  *See* John Deere & Co Sales Manual, Electrical, CAN bus electrical system (2017),
https://www.dot.state.oh.us/Divisions/ContractAdmin/Contracts/PurchDocs/207-
9/DeerComp01/6110M%20Product%20Info.pdf.

firmware into the operation of the Tractor, an error code will render the Tractor inoperable.

52.     Without access to the Software and other tools needed to diagnose and repair the error, farmers must rely on Deere dealerships and technicians to travel to where the equipment is, plug in the necessary tools, and clear the error codes.

53.     Replacing parts on a Tractor also can result in "bricking" of the machine if the proper Software is not used. After a new part is installed on a Tractor, a program called Service Advisor needs to be connected to the ECU to authorize the new parts. If the new part is not "authorized" by the Software, the engine of the Tractor will not start, rendering the Tractor useless to its owner until the owner pays a Deere technician to authorize the repair and therefore restore operation of the Tractor.

54.     During harvest time, when Tractors, including combines, are operating on a fulltime basis, it's common for mechanical issues to arise. Farmers who try to solve problems themselves or take their Tractors to more convenient repair shops are blocked from completing the necessary repairs without access to the Software. As noted below, the Plaintiff had a minor problem with his Tractor but he had to wait hours before a TriGreen technician arrived at this farm to clear an error code; a task that took less than five (5) minutes.

55.     As of 2021, the reported cost for Repair Services from Deere or an authorized Dealer could range from $150–$180 per hour, with additional charges for travel and parts. As noted below, the Plaintiff paid $615.00 dollars for a service call the lasted less than five (5) minutes.

56.     Regardless of a farmer's own ability and knowledge regarding how to repair the Tractor they own, without the relevant Software, an authorized John Deere technician must be called to perform many repairs.

57.     Logistically, this is a nightmare for many farmers. When a farmer calls a dealer to perform a repair, the farmer is at the mercy of the dealer's schedule and must pay whatever the cost is—including travel expenses—even if the problem could be fixed in 15 minutes with access to the Software.  Farmers also may work far away from the nearest dealership or technician, leadingthem to have to pay substantial amounts for travel time or the cost of having their equipment hauledto a dealership.

58.     Deere has made farmers dependent on Deere for repairs. Farmers, who often have a lifetime of skills built up enabling them to fix their own equipment, are forced to sit and wait for a service technician from Deere to arrive on site and charge $150 or more per hour for labor, on top of other costs.

59.     In a May 28, 2021 interview, a farmer named Shep Morris explained the problems with not having access to the diagnostic Software in the following manner: Morris said John Deere maintains proprietary control over much of the onboard computer systems and will only allow a John Deere-certified dealership mechanic to run a diagnostic test and do repairs. "The cost is one thing, but the timeliness is the huge thing," he said. "We have a very good mechanic here and he does an excellent job, but his boat is loaded."[7]

60.     Furthermore, given farmers' investments in Deere Tractors, which can run upwards of half a million dollars, they have no reasonable choice but to pay for Deere's Repair Services. The farmers are locked in to using Deere Tractors, as switching costs are so high and farmers expect to be able to use a Tractor for decades.

**B.  Deere's Longtime Strategy of Forced Dealership Consolidation.**

61.     In addition to being forced to purchase Repair Services from Deere, farmers in

---

[7] https://www.cbs42.com/alabama-news/alabama-farmers-at-odds-with-manufacturers-over-right-to-repair-technology-driven-equipment/

many areas are faced with limited or nonexistent choice as to which Deere Dealership to purchase Repair Services from. This lack of meaningful choice is in large part due to Deere's concerted efforts to force Dealerships to consolidate or lose their affiliation with Deere.

62.     Starting approximately in the early 2000s (and coinciding with when ECUs were first being widely used in Deere Tractors), Deere implemented an aggressive strategy that pressured Dealerships to consolidate.

63.     In a series of meetings in Louisville, Kentucky, in the summer of 2002, Deere told dealers they should plan on a future in which they would either be a buyer or a seller.[8] One former owner of a dealership in Virginia reported that in 2002 he began receiving letters, emails, and visits from Deere officials almost monthly urging him to either acquire another dealer or cash out.[9]

64.     Deere's strategy worked. In 1996, the total number of Deere Dealership locations was approximately 3,400. By 2007, this number had decreased to 2,984. In 2021, only 1,544 Dealership locations remained. Only 144 of these Dealerships are not owned by "Big Dealers," i.e., Dealerships that operate five or more individual Dealership locations. Very few single-location dealerships remain.

65.     In 2021, Deere terminated the contract of Tennessee's last remaining single-store Deere Dealership, Tri-County Equipment, which had operated as a Deere Dealershipsince 1977. Tri-County Equipment was the only single-store Dealership in Tennessee for four years prior to Deere's termination of the agreement. Deere reportedly had specified a single potential buyer for the store, but the dealer chose to operate the store as a non-Deere dealership instead of selling the business.

---

[8] Ilan Brat & Timothy Aeppel, *Why Deere Is Weeding Out Dealers Even as Farms Boom*, WallStreet Journal (Aug. 14, 2007),  https://www.wsj.com/articles/SB118705668767896842.
[9] *Id.*

66.     In the last decade, the industry-wide number of agricultural equipment stores owned by Big Dealers increased by 59%.[10] And while this large degree of consolidation among agricultural stores in general is substantial, Deere is a noticeable outlier in number of affiliated Dealerships owned by Big Dealers.   In the entire industry, the total percentage of Big Dealer-ownedAgricultural Equipment Stores is around 35%, whereas a full 91% of Deere's "Independent" Dealerships are owned by Big Dealers.

67.     The staggering amount of consolidation among Deere Dealerships is the result of Deere systematically picking off small Dealerships by coercing them to sell to a larger dealer. If a single-location Dealer wants to sell the business, Deere dictates who the purchaser can be, funneling Dealership sales to preferred Big Dealers. Deere will terminate its affiliation with the Dealership altogether if the Dealership refuses to sell to the specified buyers.

68.     One farmer complained: "I can go to a JD dealer 20 miles away. Or one 40 miles away in another direction. Or one 80 miles away in a different direction. But they all have the same name. All owned by the same franchise. So, I get 10 or 15 choices all of which are exactly the same."[11]

69.     Deere's consolidation has eliminated or reduced competition among Deere Dealerships, which charge for Repair Services with little fear of a competitor undercutting their rates. This lack of competition boosts profitability for the Dealerships, and therefore also for Deere. Deere benefits not only from forcing farmers to purchase Deere Repair Services from Deere Dealerships, but also from forcing farmers to buy these Repair Services in a market that Deere has

---

[10]  Kim Schmidt, *Big Dealers Continue to Get Bigger*, Ag Equipment Intelligence (Apr. 22, 2021), https://www.agequipmentintelligence.com/articles/4798-big-dealers-continue-to-get- bigger.

[11] *John Deere's poor dealership decision making IMO.*, post by Diggin It, TractorByNet Forum (Aug. 18, 2018), https://www.tractorbynet.com/forums/threads/john-deeres-poor-dealershipdecision-making-imo.400429/page-5.

painstakingly groomed to be less competitive.

**C. Deere's Promise—and Failure— To Provide the Full Spectrum of Repair Tools.**

70.     Because of how difficult and expensive Deere had made it for farmers to repair

their Tractors, a growing "right to repair" movement began to focus on farmer's rights to repair

John Deere agricultural equipment.

71.     Deere has a history of fighting customers' access to the onboard technology on

Deere Tractors.  In an effort to stop owners and non-authorized independent service technicians

from accessing the Software on a Deere Tractor, Deere claimed that the Digital Millennium

Copyrights Act gave it power to prevent purchasers of Deere Tractors from bypassing Technical

Protection Measures ("TPMs") "for the purposes of lawful diagnosis and repair, or aftermarket

personalization, modification, or other improvement."   This was, according to Deere, because

the owners did not actually own the software that made the Tractor run. Deere argued that the

owner only "receives an implied license for the life of the vehicle to operate the vehicle."[12]

72.     When this argument failed before the U.S. Copyright Office and bypassing TPMs

on agricultural equipment for the purpose of repair was deemed to be fair use, Deere took

another approach to blocking farmers from accessing Tractor Software.   In 2016, Deere issued

an end-user "License Agreement for John Deere Embedded Software" that forbadecustomers

from accessing, reverse-engineering, or modifying the software running on its Tractors (the

"EULA").[13] Deere states it "may terminate the license [to the embedded Tractor software]

granted under this License Agreement . . . if you violate any material term of this License

---

[12] Deere & Company, *Long Comment Regarding a Proposed Exemption Under 17 U.S.C. 1201*, https://copyright.gov/1201/2015/comments- 032715/class%2021/John_Deere_Class21_1201_2014.pdf (last accessed Jan. 4, 2022).

[13] *License Agreement for John Deere Embedded Software*, https://

Agreement. . ."[14]

73.     As public awareness of and frustration with increasingly prohibitive repair restrictions grew, state lawmakers began to act. As of 2021, 27 states have introduced some form of "right to repair" legislation.   A proposed bill in Minnesota would require manufacturers to "make available, on fair and reasonable terms, documentation, parts, and tools, inclusive of any updates to information or embedded software, to any independent repair provider or to the owner of digital electronic equipment manufactured by or on behalf of, or sold by, the original equipment manufacturer for purposes of diagnosis, maintenance, or repair."[15]

74.     In September 2018, the Equipment Dealers Association ("EDA"), a trade and lobbying group that represents John Deere and other manufacturers and often acts as Deere's mouthpiece, made a promise intended to stave off increasing pressure from customers and lawmakers to pass similar "right to repair" legislation pending around the country.[16]

75.     The EDA committed to make repair tools, Software, and diagnostics available to the public by January 1, 2021.[17]

76.     The EDA went so far as to put out a "Statement of Principles," laying out this promise. In a heavily-publicized ceremony and photo op, the EDA signed a "Memorandum of Understanding" with the California Farm Bureau that enshrined this statement of principles.[18]

77.     The Far West EDA president and CEO Joani Woelfel said in a 2018 press release

---

[14] www.deere.com/assets/pdfs/common/privacy-and- data/docs/agreement_pdfs/english/2016-10-28-Embedded-Software-EULA.pdf (last accessed Jan. 4, 2022).
[18] *Id.*
[15] Digital Fair Repair, HF 1138, 91st Leg., 2nd Engrossment (Minn. 2020), https://www.revisor.mn.gov/bills/text.php?number=HF1138&type=bill&version=2&session=ls9 1&session_year=2019&session_number=0.
[16] Koebler & Gault, *supra* note 3.

[17] *Agreement Streamlines Repair of High-Tech Farm Equipment*, Far West EDA (Sept. 9, 2018), https://fweda.com/industry-news/agreement-streamlines-repair-of-high-tech-equipment (last accessed Jan. 4, 2022).
[18] Koebler & Gault, *supra* note 3.

that the statement of principles "says a lot about the relationship between dealers and their customers."

78.     The statement of principles reads:

**STATEMENT OF PRINCIPLES:**

To the extent not already available, the maintenance, diagnostic and repair information listed below will be made available to end users through authorized agricultural dealers at fair and reasonable terms, beginning with tractors and combines put into service on or after January 1, 2021. End users will also be able to purchase or lease diagnostic tools through authorized agricultural dealers. Certain information and tools may be available earlier. Agricultural dealers are committed to providing access to:

- Manuals (Operator, Parts, Service)
- Product Guides
- Product Service Demonstrations, Training, Seminars or Clinics
- Fleet Management Information
- On-Board Diagnostics via diagnostics port or wireless interface
- Electronic Field Diagnostic Service Tools and training on how to use them
- Other publications with information on service, parts, operation and safety

Using this information and these tools, which will be available for purchase, lease or subscription from dealers, farmers will be able to identify and repair numerous problems they may encounter with their equipment. FWEDA and CFBF support equipment users' ability to maintain, diagnose and repair their machinery. However, the ability to diagnose and repair does not mean the right to modify. For safety, durability, environmental and liability reasons, diagnostic and repair information and tools will not permit consumers to do the following:

- Reset an immobilizer system or security-related electronic modules.
- Reprogram any electronic processing units or engine control units,
- Change equipment or engine settings negatively affecting emissions or safety compliance,
- Download or access the source code of any proprietary embedded software or code

79.     As journalists from the magazine Vice noted, the commitment "did not promise to actually sell repair parts, and it also contains several carve-outs that allow tractor manufacturers to continue using software locks that could prevent repair."[19]

80.     Three years later in mid-2021, farmers still struggle to get anything promised in the agreement with the EDA.

81.     Posing as a customer, Right to Repair advocate Kevin O'Reilly called 12 John Deere dealerships in six states. Of those, 11 told Mr. O'Reilly that they don't sell diagnostic software, and the last one gave him an email of someone to ask for the tools. When Mr. O'Reilly sent an email to the individual identified, he did not receive a response.[20]

82.     Similarly, journalists from Vice who attempted to assess the availability of the

---

[19] Jason Koebler, Farmer Lobbying Group Sells Out Farmers, Helps Enshrine John Deere's Tractor Repair Monopoly, Vice Motherboard (Sept. 11, 2018), https://www.vice.com/en/article/kz5qgw/california-farm-bureau-john-deere-tractor-hacking- right-to-repair.
[20] Koebler & Gault, supra note 3.

Software called nine dealerships in seven states and were told by representatives that the things promised by the EDA were not available. The journalists called three dealerships in California; two said no immediately, and a third told the journalists that the repair software and tools could not be sold to the public and required the purchaser to be a licensed dealer.[21]

83.   A spokesperson for the AEM, another manufacturers' lobbying and trade group that often represents Deere, told Vice that, "Comprehensive repair and diagnostic information is now available for the vast majority of the tractor and combine market through authorized dealers." However, the spokesperson failed to respond when Vice asked if the spokesperson could point to a single instance where this is actually the case, or a single manufacturer that explains to farmers where they can get this information or these tools.

84.   If these tools were actually available to farmers and independent repair shops, then it would be simple for Deere to point to where they could be accessed and where they could be purchased. Although it cannot point to any real-world examples where this is the case, the company and its industry representatives insist that these tools are available.

85.   As one example, David Ward, a spokesperson for Association of Equipment Manufacturers (AEM), told Vice that comprehensive repair and diagnostic equipment is now available through authorized dealers. Ward did not return emails when Vice followed up, asking for a single instance of where this is actually the case, or a single manufacturer that explains to farmers where they can get the information or the tools.

86.   On the other hand, there are plenty of examples that demonstrate how the Software remains inaccessible, even to individuals and businesses who are by all accounts highly sophisticated parties familiar with the industry.

---

[21] *Id.*

87. By implying that owning a Deere Tractor does not require farmers to rely on Dealerships for repairs, Deere intentionally obscures the fact that the Software is necessary for diagnosis and completion of a large number of these repairs. Deere's misleading statements fail to provide information on the scope of repairs and maintenance that can be accomplished without the Software, preventing farmers from being able to accurately assess the overall cost of owning a Deere Tractor.

88. Even Rick Pate Alabama's Commissioner of Agriculture and Industries agrees that Alabama farmers presently don't have the ability to fix their Tractors: "There's plenty of laws that show this is a violation of anti-trust laws. I think if people spend that kind of money on a piece of equipment, they own that equipment. It's a pretty simple jump to say they outa be able to fix it," Pate said.[22]

### D. To the Extent Deere Has Made Diagnostic and Repair Tools Available, They Are Insufficient to Restore Competition to the Deere Repair Services Market.

89. Beginning sometime around June 2021, John Deere quietly created a web page on their main company site[36] for a product called Customer Service ADVISOR, with a form to "request more info" about a subscription. One dealer website describes Customer Service ADVISOR as a way for customers to access "much of the same" technical and diagnostic information used by dealership technicians.[37] However, this pared-down system explicitly does not include every feature that dealers have access to, and costs *start at* $8,500 for the first year alone.[38] If Deere charges customers the same amount per year, in six years this would amount to an extra $51,000 paid by customers who want to perform their own repairs. Over the course of the lifetime use of a Deere Tractor, the cost to maintain access to the Software necessary to

---

[22] *See,* https://www.cbs42.com/alabama-news/alabama-farmers-at-odds-with-manufacturers-over-right-to-repair-technology-driven-equipment/

individually perform repairs could amount to the total price of the Tractor itself.

90. Furthermore, there is no indication that Deere will provide sufficient repair tools to independent repair shops or, for that matter, even to customers. The only apparent way to access materials is to place a request with an individual dealership, and there is no guarantee or timeline of when Customer Service ADVISOR is available.

91. It is also unclear if Deere is simply calling attention to the already-existing, extremely limited capability customer version of Service ADVISOR. This barebones version allows a customer to troubleshoot codes but offers minimal functionality otherwise. A farmer or independent repair shop is not able to use the software, for example, to replace a sensor and recalibrate a Tractor. As one employee of a Deere dealership described it in 2016, the customer version is "a waste of your money." The same employee also described the version of Customer Service Advisor as "similar to [Service Advisor] but they really give you only enough to help your dealer cut down on the labor if you troubleshoot it yourself. If they let you calibrate, us dealer guys wouldn't have any work".

92. Deere continues to carefully guard access to the Software necessary to make repairs, and to the extent it has made a watered-down version of it available to its customers, it has priced it so high that the access to the Software will be an unattractive option to most customers, even in comparison to the high cost of paying Deere for Repair Services. This arrangement thus allows Deere to claim it has provided repair and diagnostic materials to its customers while posing virtually no risk to Deere's monopoly in the Deere Repair Services Market.

**E. There Are No Legitimate Reasons to Restrict Access to Necessary Repair Tools.**

93.     In May 2021, the FTC issue a report regarding repair restrictions.[23] The FTC concluded there was "scant evidence to support manufacturers' justificationsfor repair restrictions" and that access to information, manuals, spare parts, and tools, were "well-supported by comments submitted for the record and testimony provided at the Workshop." Specifically, the FTC noted that restricting repairs to authorized repairnetworks was not automatically justified just because of the existence of possible safety concerns.The FTC noted that manufacturers provided no factual support for their statements that "authorized repair persons are more careful or that individuals or independent repair shops fail to take appropriate safety precautions."

94.     Similarly, the FTC pointed out that manufacturers had failed to offer evidence thatproviding access to the same tools made available to authorized service providers created additional security risks. The FTC concluded "[m]anufacturers can provide others with the same parts and tools that they provide to their authorized service providers. And, by providing access to individuals and independent repair shops, manufacturers would have greater confidence in the repair activities that occur outside of their authorized networks."

95.     The FTC stated that, beyond bare assertions of liability exposure and reputational harm from allowing independent repairs, manufacturers "provided no empirical evidence to support their concerns about reputational harm or potential liability resulting from faulty third party repairs."[46] The report further noted that manufacturers' arguments regarding the "superior service" were anecdotal, whereas there was evidence that consumers were generally satisfied with repairs made by independent repair shops. The FTC concluded that "[t]he record does not establish

_____

[23] Federal Trade Commission, Nixing the Fix: An FTC report to Congress on Repair Restrictions (May 2021), available at https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftcreport-congress-repair-restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf (hereinafter "FTC Report").

that repairs conducted by independent repair shops would be inferior to those conducted by authorized repair shops if independent repair shops were provided with greater access to service manuals, diagnostic software and tools, and replacement parts as appropriate."

96.     There is no defensible basis for Deere to withhold the full spectrum of Dealer-level Software that a farmer or independent repair shop would need to diagnose or perform repairs. In fact, the automotive industry is an example of manufacturers agreeing to do just that. Industrywide, vehicle owners and independent repair shops have had access to Dealer-level diagnostic and repair tools from the manufacturers for nearly eight years. In 2014, the automotive industry through representative trade organizations voluntarily agreed to

> make available for purchase by owners of motor vehicles manufactured by such manufacturer and by independent repair facilities **the same diagnostic and repair information**, including repair technical updates, **that such manufacturer makes available to its dealers** through the manufacturer's internet-based diagnostic and repair information system or other electronically accessible manufacturer's repair information system. All content in any such manufacturer's repair information system shall be **made available to owners and to independent facilities in the same form and manner and to the same extent as is made available to dealers** utilizing such diagnostic and repair information system for purchase by owners and independent repair facilities on a daily, monthly, and yearly subscription basis and upon fair and reasonable terms.[24]

**F.  Deere Has Not Provided Farmers and Independent Repair Shops with the Necessary Software and Continues to Misrepresent the Issue.**

97.     To the extent that Deere has made limited repair information and tools available, it has been insufficient to give farmers and independent repair shops the same opportunity to repair their Tractors and to open the Deere Repair Services Market to true competition.

98.     Deere must provide access to the same tools that the dealers have to both farmers

---

[24] Memorandum of Understanding, Automotive Aftermarket Industry Association, Coalition for Auto Repair Equality, Alliance of Automobile Manufacturers, and Association of Global Automakers (Jan. 15, 2014) (emphasis added), https://www.autocare.org/docs/defaultsource/government-affairs/r2r-mou-and-agreement-signed.pdf.

and independent repair shops.

99.     Deere has also resisted making the Software and tools available to farmers and independent repair shops under the auspices of "ensur[ing] continued compliance with emissions, operator safety and other regulatory requirements."[25] Deere's claims that providing access to Software and repair tools would allow farmers to bypass emissions and safety controls misrepresents what farmers are asking for.

100.     There is a clear difference between resetting an error code and ignoring or overriding safety codes. Overriding emissions or safety controls requires a different set of modification tools, which are *not* the tools used for diagnosis and repair. The FTC pointed out that data submitted by the EDA ostensibly showing that modifications of agricultural equipment affected emissions was inapposite, "because [the data] concerns modifications to equipment as opposed to repairs." The FTC also noted conversations with AEM and EDA representatives confirmed the limitations of the submitted studies.

101.     In order to override emission controls on a Tractor, the entire operating system on the machine would have to be erased and then replaced with new, modified software that either does not have emissions and safety controls or allows a farmer to ignore them. This is an illegal practice separate from the issue of access to Software and is not what is being requested in this litigation.

102.     Deere and industry groups have latched onto this talking point—conflating "repair" and "modification"—in their successful attempt to foreclose others from the market and thereby maintain Deere's monopoly in the Deere Repair Services Market.

### G.  Defendant's Monopolization of the Deere Repair Services Market Has Led to

---

[25] Deere & Co Position Letter on Kansas HB 2122: Digital Electronic Repair Requirements, available at https://www.vice.com/en/article/mgxayp/source-apple-will-fight-right-to-repairlegislation.

**Artificially High Prices and Record Profits for John Deere.**

103.     Rent motivates Deere's restricting access to the Software and maintaining  its

unlawful tying arrangement and monopoly and attempted monopoly in the Deere Repair Services

Market. For Deere and its Dealerships, parts and services are three to six times more profitable

than sales of the original equipment, and the repair segment of Deere's business has also been

growing faster than original equipment sales. From 2013 to 2019, Deere's annual parts sales

went up 22%, while the company's total agricultural equipment sales went down 19% in this

same period.[26]

104.     During this period where Deere's Tractors with ECUs reached greater market

penetration and as Deere systematically eliminated small Dealerships that were creating

competition and undercutting profits for Deere's Big Dealers, the company's income skyrocketed.

In 2000, Deere's net income was around a half billion dollars. Deere's projected 2021 net

income is $5.7B, over 11 times its income from 2000, and over twice its net income of $2.75B in

2020. Although Deere does not break down the income received from the Dealerships' sales of

Repair Services in its company filings, sales of "parts and maintenance services" are reported to

account for a fifth of Deere's sales.[27] In the last several years, the reported profit margins not

associates with direct sales increased dramatically, and the company stated to investors in 2020

that it was betting on its parts and maintenance services business to contribute 50 basis points in

added profits over the next two years.

105.     Without access to the Software to perform repairs and clear fault codes, owners of

---

[26] Peter Waldman & Lydia Mulvany, Farmers Fight John Deere Over Who Gets to Fix an
$800,000 Tractor, Bloomberg Businessweek (Mar. 5, 2020), https://www.bloomberg.com/news/features/2020-03-05/farmers-fight-john-deere-over-who-getsto-fix-an-800-000-tractor.
[27] Peter Waldman & Lydia Mulvany, Farmers Fight John Deere Over Who Gets to Fix an
$800,000 Tractor, Bloomberg Businessweek (Mar. 5, 2020), https://www.bloomberg.com/news/features/2020-03-05/farmers-fight-john-deere-over-who-getsto-fix-an-800-000-tractor.

Deere Tractors have been forced to give Deere and its Dealerships more money for Deere Repair Services that the farmers would have expended had they performed the repairs themselves or hired less expensive, and often more convenient, independent repair shops to perform. One farmer reported that he purchased a new Tractor for $300,000.00 and spent nearly $8,000.00 into clearing fault codes over the course of a few years.

106.    The money that farmers sink into paying Deere to clear fault codes and approve repairs that they could have performed themselves cut into an already thin profit margin.

## VII.    CLASS ACTION ALLEGATIONS

107.    Plaintiff brings this action on behalf of himself, and as a class action under the FederalRules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedures, seeking damages and equitable and injunctive relief on behalf of the following class (the "Class"):

> All persons and entities residing in Mississippi who, during the Class Period of January 12, 2018 to the present, purchased DeereRepair Services for Deere Tractors from Defendant or Deere'sauthorized Dealers and/or technicians.

108.    Specifically excluded from the Class are Deere and its employees, affiliates, subsidiaries, and joint venturers, whether or not named in this Complaint.

109.    **Class Identity**. The above-defined Class is readily identifiable and is one for which records should exist.

110.    **Numerosity**. Plaintiff does not know the exact number of class members because such information presently is in the exclusive control of Defendant. Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

111. **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased Deere Repair Services from Defendant, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

112. **Common Questions Predominate**. There are questions of law and fact common to the Class, including, but not limited to:

    A. Whether the Alabama, Mississippi and Tennessee Deere Repair Services Market constitutes a RelevantMarket (hereinafter "Tri State Market);

    B. Whether Deere possesses market power in this Relevant Market;

    C. Whether Deere colluded with Co-conspirator Dealerships to suppress competition for Deere Repair Services between Deere Dealerships in violationof Section 1 of the Sherman Act;

    D. Whether Deere colluded with Co-conspirator Dealerships to prevent farmers and independent repair shops from having access to the Software in violation of Section 1 of the Sherman Act;

    E. Whether Deere illegally tied the sale of Deere Repair Services to Deere Tractorsin violation of Section 1 of the Sherman Act;

    F. Whether Deere monopolized or attempted to monopolize the Deere Repair Services Market in the Tri State Market in violation of Section 2 of the Sherman Act;

    G. Whether Deere engaged in monopoly leveraging by using its monopoly powerin the Deere Software Market to gain or attempt to gain or maintain monopolypower in the Deere Repair Services Market in violation of Section 2 of the Sherman Act;

    H. Whether Deere unjustly enriched itself to the detriment of the Plaintiff and theClass, thereby entitling Plaintiff and the Class to disgorgement of all benefits derived by Deere;

    I. Whether the conduct of Defendant, as alleged in this Complaint, caused injuryto the business or property of the Plaintiff and the other members of the Class;

    J. The effect of Defendant's alleged monopolization or attempted monopolizationon the prices of Deere Repair Services sold in the United States during the ClassPeriod;

    K. Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief;and

    L. The appropriate class-wide measure of damages.

These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

113. **Adequacy**. Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class who purchased Deere Repair Services from Defendant and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

114. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the Class is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

115. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

116. Plaintiff brings this case on behalf of the Class and all persons and entities similarly situated pursuant to Rule 23, on behalf of all persons and entities that purchased Deere Repair

Services that Defendant provided during the Class Period.

117.    Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VIII.   NAMED PLAINTIFF ALLEGATIONS

118.    Blake Johnson is a farmer in Michie, Tennessee.

119.    Blake Johnson purchased a brand-new John Deere 6105E 105hp tractor from the Tri-Green, in Florence, Alabama.

120.    Since he has owned the tractor, it has occasionally broken down. Due to John Deere's anti-competitive practices, Johnson has not been able to use aftermarket parts or have any independent mechanics repair the equipment.

121.    In July 2021, the tractor would not move out of neutral.  Johnson brought the tractor to the closest servicing and repair option available to him, Wade, Inc., a John Deere Dealer in Corinth, Mississippi.

122.    The technician hooked the machine to the ECU diagnostic machine, and found that a fuse was blown, the fuse was replaced and he was charged $299.28.

123.    Just a few months later, the tractor again would not move out of neutral.   Johnson brought it back to Wade, Inc.   The issue found was some wires under the seat of the tractor had shorted out, but the technician had to run the ECU diagnostic machine and told Johnson that the computer had to be reset.  The total bill for this repair was $1,510.12.

124.    Due to John Deere and co-conspirator TriGreen's practices, Johnson has no alternative other than to submit himself to this kind of fleecing.

125.    Johnson is bringing this case to help not only himself but the millions of small farmers like himself that have fallen prey to John Deere's anti-competitive practices.

## IX.    ANTITRUST INJURY

126.    Defendant's anticompetitive conduct had the following effects, among others:

A.  Price competition has been restrained or eliminated with respect to DeereRepair Services;

B.  The prices of Deere Repair Services have been fixed, raised, stabilized, ormaintained at artificially inflated levels;

C.  Purchasers of Deere Repair Services have been deprived of free and opencompetition; and

D.  Purchasers of Deere Repair Services, including Plaintiff, paid artificiallyinflated prices.

127.    The purpose of Deere's conduct was to exclude competition and raise, fix, or maintain the price of Deere Repair Services. As a direct and foreseeable result, Plaintiff and the Class paid supracompetitive prices for Deere Repair Services during the Class Period.

128.    By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their businesses or property, having paid higher prices for Deere Repair Services than they would have paid in the absence of Deere's illegal conduct, and as a result have suffered damages.

129.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## X.    CLAIMS FOR RELIEF

**COUNT ONE**
**Violation of Section 1 of the Sherman Act**
**(Conspiracy in Restraint of Trade)**
**15 U.S.C. § 1**

130.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

131.    Beginning in or around 2000, Defendant entered into and engaged in unlawful

contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce with Co-conspirator Dealerships in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

132.     Defendant engaged in predatory and anticompetitive behavior by restricting competition among its affiliated Dealerships, which unfairly suppressed price competition for Deere Repair Services and unreasonably restrained trade.

133.     Defendant's conduct included concerted efforts, actions and undertakings among Defendant and the Co-conspirator Dealerships with the intent, purpose, and effect of artificially suppressing competition from smaller dealerships.

134.     Defendant perpetrated the scheme with the specific intent of reducing competition in the Deere Repair Services market to the benefit of Defendant and the Co-conspirator Dealerships.

135.     Defendant's conduct in furtherance of its contracts, combinations and/or conspiracies were authorized, ordered, or done by its respective officers, directors, agents, employees, or representatives while actively engaging in the management of Defendant's affairs.

136.     Plaintiff and Class Members paid higher rates for Deere Repair Services from Deere and its Co-Conspirator Dealerships than they otherwise would have in the absence of Defendant's unlawful conduct, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

137.     Defendant's contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of the Sherman Act.

138.     In the alternative, Defendant is liable under a "quick look" analysis where an observer with a rudimentary understanding of economics could conclude that the arrangements in

question would have an anticompetitive effect on customers and markets.

139.    Defendant's contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

140.    As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

**COUNT TWO**
**Violation of Section 1 of the Sherman Act**
**(Group Boycott)**
 **15 U.S.C. § 1**

141.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

142.    Beginning approximately in 2000 and continuing thereafter to the present, Defendant, by and through its officers, directors, employees, agents, or other representatives, have explicitly or implicitly colluded with Co-conspirator Dealerships to jointly boycott entities that would have introduced price-reducing sales of Deere Repair Services in the United States, in order to artificially raise, fix, maintain, and/or stabilize prices in the Deere Repair Services market, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

143.    Defendant's and the Co-conspirator Dealerships' refusal to sell Software and repair tools to individual farmers and independent repair shops constitutes a per se violation of Section One of the Sherman Act.

144.    Defendant's and the Co-conspirator Dealerships' boycott cut off access to the Software, a necessary resource that would enable farmers and independent repair shops to compete

in the Deere Repair Services market.

145.     Together, Defendant and the Co-conspirator Dealerships wholly control the market for Deere Repair Services.

146.     No plausible pro-competitive arguments exist for Defendant's and the Co-conspirator Dealerships' refusal to sell the Software to farmer or independent repair shops.

147.     As a direct and proximate result of Defendant's contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

**COUNT THREE**
**Violation of Section 1 of the Sherman Act**
**(Unlawful Tying Arrangement)**
**15 U.S.C. § 1**

148.     Plaintiff incorporates and realleges, as though fully set forth herein, each and everyallegation set forth in the preceding paragraphs of this Complaint.

149.     This cause of action is brough under Section 1 of the Sherman Act, 15 U.S.C. § 1.

150.     A tying arrangement exists when a seller exploits power over one product (the tying product) to force the buyer to accept a second product (the tied product). *Batson v. Live Nation Entm't*, 746 F.3d 827, 832 (7th Cir. 2014).   Such an arrangement violates Section 1 of the Sherman Act if the seller has appreciable economic power in the tying product market and the arrangementaffects a substantial volume of commerce in the tied market. *Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451, 462 (1992).

151.     Deere Tractors and Deere Repair Services are distinct and separate products and services.

152. Plaintiff and Class members through their purchase of Deere Tractors were coerced into purchasing a second tied product, Deere Repair Services, from Defendant and its Co-Conspirator Dealerships.

153. Defendant's aggressive consolidation of its affiliated Co-conspirator Dealerships also materially changed the dynamics of the Deere Repair Services Market, drastically reducing the pressure of pricing competition even among the Dealerships.

154. Furthermore, Defendant represented to Plaintiffs and the Class that most necessary repair tools were available and that almost all repairs could be done on the Tractors without the Software. These misleading statements meant that Plaintiff and the Class could not, from Deere's representations, engage in accurate lifecycle pricing for Deere Tractors before they were locked into purchasing Deere Repair Services from Defendant and the Dealerships.

155. As set out above, Defendant has appreciable economic power in the relevant Tractor Markets, *i.e.*, the "tying" markets.

156. This tying arrangement affected a substantial amount of interstate commerce.

157. Defendant's tying arrangement is a *per se* violation of Section 1 of the Sherman Act. The Defendant has substantial market power in both markets. Defendant's ability to substantially raise prices without a loss of market share demonstrates that it has market power in both markets.

158. Defendant's tying arrangement also violates Section 1 of the Sherman under a rule of reason theory. The Defendant's practices lock-in plaintiff and class members and coerces them into accepting unreasonable restrictions on the ability to service the Tractors they purchased from John Deere or a co-conspirator.

159. There are no legitimate business justifications for Defendant's illegal tying

arrangement.

160.     Defendant has a substantial economic interest in sales of Deere Repair Services.

**COUNT FOUR**
**Violation of Section 2 of the Sherman Act**
**(Monopolization)**
**15 U.S.C. § 2**

161.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every

allegation set forth in the preceding paragraphs of this Complaint.

162.     This cause of action is brough under Section 2 of the Sherman Act, 15 U.S.C. § 2,

which prohibits "monopoliz[ation of] any part of the trade or commerce among the several states,

or with foreign nations."

163.     Deere has monopoly power in the Deere Repair Services Market, including the

power to control prices and exclude competition.

164.     Deere has willfully and intentionally engaged in anticompetitive conduct in order

to unlawfully maintain its monopoly in this market, in violation of Section 2 of the Sherman Act,

15 U.S.C. § 2.

165.     Deere has unreasonably restrained, and further threatens to unreasonably restrain

competition in the Deere Repair Services Market by:

(a) restricting the availability of the Software necessary to perform
     diagnostics and repairsfor Deere Tractors;
(b) knowingly misrepresenting the availability and necessity of the Software
     necessary fordiagnostics and repairs for Deere Tractors;
(c) tying the purchase of Repair Services through Deere to the purchase of
     Deere Tractors;and
(d) limiting farmers' rights over their own Tractors through the terms of the
     2016 EULA with the aim of restricting farmers' ability to choose to
     perform Deere Repair Servicesthemselves or take their Tractor to an
     independent repair shop.

166.     While some of these anticompetitive acts themselves constitute an individual

antitrust violation on a stand-alone basis, together they support a broader monopolization claim.

167.    As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things: (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independentDeere Repair Services and self-repair options.

**COUNT FIVE**
**Violation of Section 2 of the Sherman Act**
**(Monopoly Leveraging)**
**15 U.S.C. § 2**

168.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

169.    As detailed above, Deere has monopoly power over Deere Software.

170.    Deere has willfully and intentionally used its monopoly power over Deere Software to gain or attempt to gain or maintain monopoly power in the Deere Repair Services Market, specifically, by tying purchases of Deere Tractors to Deere-provided Repair Services through deliberate restriction of access to the full spectrum of Software necessary to run diagnostics, approve repairs, and perform maintenance. Deere's actions cannot be justified on the basis of any legitimate consumer benefit.

171.    Furthermore, Deere also leveraged its monopoly power over Deere Software to effectuate the 2016 EULA, limiting farmers' ownership rights over their own Tractors and forcing farmers to purchase Deere-provided Repair Services. The EULA impermissibly restricts farmers' ability to perform Deere Repair Services themselves by prohibiting attempts to reverse engineer, adapt, or otherwise circumvent the Software. Deere threatens that it may terminate the license to the Software—and therefore access to a functional Tractor—if a farmer interacts with the Software in a way that Deere deems to be a violation of the EULA.

172.    Deere willfully has acquired or maintained monopoly power by the exclusionary conduct detailed above, rather than through legitimate business acumen, skill, efficiency, or legitimate innovation.

173.    As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things, (i) the payment of supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent Deere Repair Services and self-repair options.

**COUNT SIX**
**Violation of Section 2 of the Sherman Act**
**(Attempted Monopolization in the Alternative)**
**15 U.S.C. § 2**

174.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

175.    As detailed above, Deere has monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the Deere Repair Services Market, including the power to control prices and exclude competition.

176.    Deere has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Repair Services Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

177.    Deere's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Repair Services Market. Deere's ongoing anticompetitive conduct presents a dangerous probability that Deere will succeed, to the extent it has not already, in its attempt to monopolize the Repair Service Market.

178.    As a direct and proximate result of Deere's anticompetitive and monopolistic conduct, Plaintiff and the Class have been damaged by, among other things, (i) the payment of

supracompetitive prices for Deere Repair Services; and (ii) the lack of availability of independent

Deere Repair Services and self-repair options.

**COUNT SEVEN**
**Violation of Section 2 of the Sherman Act**
**(Conspiracy to Monopolize)**
**15 U.S.C. § 2**

179.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every

allegation set forth in the preceding paragraphs of this Complaint.

180.    Beginning approximately in 2000 and continuing thereafter to the present,

Defendant, by and through its officers, directors, employees, agents, or other representatives, have

explicitly or implicitly conspired with Co-conspirator Dealerships to jointly boycott entities that

would have introduced price-reducing sales of Deere Repair Services and the Dealerships have

willfully, knowingly, and with specific intent to do so, conspired to monopolize the Repair

Services Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

181.    No plausible pro-competitive arguments exist for Defendant's and the Co-

conspirator Dealerships' refusal to sell the Software to farmer or independent repair shops.

182.    Defendant's and the Co-conspirator Dealerships' boycott cut off access to the

Software, a necessary resource that would enable farmers and independent repair shops to compete

in the Deere Repair Services market.

183.    As a direct and proximate result of Deere and the Dealerships' conspiracy to

restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business

or property and will continue to suffer economic injury and deprivation of the benefit of free and

fair competition.

**COUNT EIGHT**
**Promissory Estoppel**

184.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

185.    Defendant made unambiguous promises through statements to Plaintiff and the Class that Deere Tractors could be repaired through software, tools, and resources made available by Deere and its Dealerships.

186.    Plaintiff and the Class relied on Defendant's promise by purchasing, leasing, and continuing to use and operate Deere Tractors, and that reliance was both expected and foreseeable.

187.    Plaintiff and Class members' reliance on Defendant's promises were to their detriment. Plaintiff and the Class have paid, and continue to pay, much higher rates for Deere Repair Services than they would have had Defendant fulfilled its promise to make necessary Software and resources to perform repairs available.

**COUNT NINE**
**Unjust Enrichment**

188.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

189.    Deere has benefitted from the monopoly profits on the sale of Repair Services resulting from the unlawful and inequitable acts alleged in this Complaint.

190.    Deere's financial benefit resulting from unlawful and inequitable conduct is traceable to overpayments for Repair Services by Plaintiff and the Class.

191.    Plaintiff and the Class have conferred upon Deere an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiff and the Class.

192.    The economic benefit of overcharges and unlawful monopoly profits derived by Deere through Plaintiffs' payment of supra-competitive and artificially inflated prices for Deere

Repair Services is a direct and proximate result of Deere's unlawful practices.

193. The financial benefits derived by Deere rightfully belong to Plaintiff and the Class, as Plaintiff and the Class paid anticompetitive and monopolistic prices during the Class Period, inuring to the benefit of Deere.

194. It would be inequitable under unjust enrichment principles in the District of Columbia and each of the fifty states for Deere to be permitted to retain any of the overcharges for Repair Services derived from Deere's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

195. Deere is aware of and appreciated the benefits bestowed upon it by Plaintiff and the Class.

196. Deere should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds it received.

197. A constructive trust should be imposed upon all unlawful or inequitable sums received by Deere traceable to Plaintiff and the Class.

## XI.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class of all others so similarly situated, respectfully requests judgment against Defendant as follows:

198. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

199. The unlawful conduct herein be adjudged and decreed in violation of Section 1 and

Section 2 of the Sherman Act.

200. Plaintiff and the Class recover damages, to the maximum extent allowed, and that a joint and several judgment in favor of Plaintiff and the members of the Class be entered against Defendant in an amount to be trebled to the extent the laws permit;

201. Defendant, its affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct alleged herein, or from engaging in other conduct having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

202. Plaintiff and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

203. Plaintiff and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

204. Plaintiff and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMANDED

205. Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Submitted this the 15th day of March 2022.

*/s/ Walter Alan Davis*
Walter Alan Davis, MSB #9875
Dunbar Davis, PLLC

324 Jackson Avenue East, Suite A
Oxford, Mississippi 38655
Phone:    (662) 281-0001
Fax:        (662) 281-1201
waltdavis@dunbardavis.com

*Counsel for Plaintiff Blake Johnson*

Eric J. Artrip (ASB-9673-I68E)
D. Anthony Mastando (ASB-0893-X32B)
MASTANDO & ARTRIP, LLC
301 Washington St., Suite 302
Huntsville, Alabama  35801
Phone: (256) 532-2222
Fax:    (256) 513-7489
artrip@mastandoartrip.com
tony@mastandoartrip.com

Richard P. Rouco  (ASB-6182-R76R)
QUINN, CONNOR, WEAVER,  DAVIES & ROUCO LLP
2- 20th Street North, Suite 930
Birmingham, Alabama 35203
Phone: (205) 870-9989
Fax:  (205) 803-4143
rrouco@qcwdr.com

Joe R. Whatley
Tucker Brown
WHATLEY KALLAS, LLC
2001 Park Place Suite 1000
Birmingham, Alabama 35203
Phone: (205) 488-1200
Fax: (205) 800-922-4851
jwhatley@whatleykallas.com
tbrown@whatleykallas.com

*Of counsel and pro hac vice applications
forthcoming*